**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 11-24653-CIV-ALTONAGA/Simonton**

**DANTZLER, INC.,** *et al.*,

      Plaintiffs,

vs.

**PNC BANK, NATIONAL
ASSOCIATION**,

      Defendant.

_____/

## ORDER

    **THIS CAUSE** came before the Court on Defendant, PNC Bank, National Association's ("PNC['s]") Motion for Summary Final Judgment . . . ("Motion") [ECF No. 104], together with a Statement of Material Facts ("Defendant's SMF") [ECF No. 103], both filed on February 19, 2013. Plaintiffs, Dantzler, Inc. and Dantzler Trade, Inc. (collectively, "Plaintiffs" or "Dantzler"), filed a Response and Incorporated Memorandum of Law . . . ("Response") [ECF No. 119] on March 26, 2013, and an Opposing Statement of Material Facts ("Plaintiffs' SMF") [ECF No. 116] on March 22, 2013. Defendant submitted a Reply in Support of its Motion . . . ("Reply") [ECF No. 122] on March 29, 2013. On April 10, 2013, the Court heard oral arguments on the Motion at a hearing ("April 10 hearing") [ECF No. 130] and permitted the parties to submit supplemental memoranda on a particular issue. Dantzler filed its Memorandum . . . ("Supplemental Memorandum") [ECF No. 132] on April 16, 2013, and PNC filed its Reply to Plaintiffs' Memorandum . . . ("Response to Supplemental Memorandum") [ECF No. 134] on April 18, 2013. The Court has carefully considered the parties' written submissions, the record, oral arguments presented at the April 10 hearing, and applicable law.

# I. BACKGROUND

This case involves certain claims in connection with the closing of a $27.5 million loan agreement. Plaintiffs' Complaint states claims of fraudulent inducement (Count I), negligent misrepresentation (Count II), and mutual mistake (Count III) in connection with the parties' loan agreement. (*See generally* Compl. [ECF No. 1-2]). Dantzler seeks rescission of the loan agreement entered into by the parties, damages for the costs incurred by Dantzler in connection with the agreement including subsequent attempts to obtain new funding sources, related damages, and all other appropriate relief. (*See id.* 19, 21–22, 24). PNC removed the action on December 30, 2011 under the Court's diversity jurisdiction. (*See generally* Notice of Removal [ECF No. 1]). In the present Motion, PNC contends the undisputed facts demonstrate all of Plaintiffs' claims are without merit and summary judgment should be entered in its favor. (*See* Mot. 3).

## A. The Parties' Preliminary Discussions (Before April 2011)

Plaintiffs are affiliated companies involved in the manufacture and distribution of lumber and construction materials in the United States and abroad. (*See* Def.'s SMF ¶ 1; Pls.' SMF ¶ 1). In 2009, Plaintiffs decided to explore potential refinancing options, including the opening of a line of credit with a new lender. (*See* Def.'s SMF ¶ 2; Pls.' SMF ¶ 2). At the time, Plaintiffs maintained a line of credit through GE Capital. (*See id.*). In the summer of 2010, while Plaintiffs' exploration of potential refinancing options was ongoing, PNC solicited Plaintiffs' business. (*See* Def.'s SMF ¶ 3; Pls.' SMF ¶ 3).

At the beginning of the parties' negotiations, on October 15, 2010, PNC's Business Development Officer who was handling the Dantzler loan (the "Loan"), Rocio de Ojeda ("Ms. de Ojeda"), sent an e-mail to Plaintiffs' President, Antonio Godinez ("Mr. Godinez"), advising him,

"On the borrowing base, you only need to submit the borrowing base [certificate] once a month

but we do need the sales and collections updated once a week (this is done on-line and it[']s very

easy)."  (Feb. 12, 2013 Notice of Filing, Ex. 1[1] at 1 [ECF No. 97-1]; *see also* Def.'s SMF ¶ 4;

Pls.' SMF ¶ 4).

On October 18, 2010, Plaintiffs and PNC executed a preliminary term sheet (the

"October 2010 Term Sheet") in which PNC "present[ed] for preliminary discussion purposes

only, a proposal to underwrite the senior secured financing of up to $30,000,000[.00] . . . ."

(Feb. 12, 2013 Notice of Filing, Ex. 2 at 3; *see also* Def.'s SMF ¶ 5; Pls.' SMF ¶ 5).  The

October 2010 Term Sheet expressly advised Plaintiffs that PNC's proposed revolving credit

facility (the "Revolving Credit Facility") was up to thirty million dollars subject to a borrowing

base (the "Borrowing Base"), which limited the amount of credit available to Plaintiffs.  (*See*

Feb. 12, 2013 Notice of Filing Ex. 2, at 3, 7; *see also* Def.'s SMF ¶ 6; Pls.' SMF ¶ 6).  The

October 2010 Term Sheet expressly advised Plaintiffs that the amount of the Borrowing Base

would be calculated using two primary data points, Plaintiffs' accounts receivable ("AR") and

inventory.  (*See* Feb. 12, 2013 Notice of Filing Ex. 2, at 3, 7; *see also* Def.'s SMF ¶ 6; Pls.' SMF

¶ 6).  It also advised Plaintiffs they would be subject to certain financial reporting requirements,

including but not limited to, "monthly Borrowing Base certificates [("BBC[s]")] with sales and

collections reported weekly."  (Feb. 12, 2013 Notice of Filing, Ex. 2 at 12; *see also* Def.'s SMF ¶

6; Pls.' SMF ¶ 6 ).[2]

---

[1] The parties' Notices of Filing contain lists of the enclosed depositions, business records, and documents.
Except in the case of depositions, the Court will refer to the Notice of Filing and the Exhibit number
attributed to the relevant document(s) in the Notice of Filing.  (*See, e.g.*, February 12, 2013 Notice of
Filing [ECF No. 97]).  Depositions will be referenced by the date the deposition took place, and the
individual deposed.

[2] Dantzler contends the financial reporting requirements discussed in the October 2010 Term Sheet dealt
solely with post-closing financial reporting requirements (*see* Pls.' SMF ¶ 6), but offers no record citation

The October 2010 Term Sheet set forth specific conditions precedent Dantzler was required to meet in order for PNC to close the Revolving Credit Facility, including: "The Borrower will have minimum excess revolving credit availability [("Excess Loan Availability")] of $3,500,000[.00], at closing after Fees, expenses, and subtraction of trade payables 60 days or more past due. Such availability [is] to be evidenced by a [BBC] for the Revolving Credit Facility, satisfactory to . . . the Lender." (Feb. 12, 2013 Notice of Filing, Ex. 2 at 10–11; *see also* Def.'s SMF ¶ 8; Pls.' SMF ¶ 8). Finally, the October 2010 Term Sheet expressly advised Plaintiffs that it was not a binding agreement on PNC. (*See* Feb. 12, 2013 Notice of Filing, Ex. 2 at 4 ("It is understood that this letter and Preliminary Term Sheet merely constitute a statement of suggested terms for discussion with respect to the transactions contemplated herein . . . and, therefore, do not constitute a binding commitment with respect to these transactions. A binding commitment with respect to the Credit Facility will result only from execution and delivery by all of the parties of a definitive agreement relating to the Credit Facility, subject to the conditions contained herein.")).

On March 1, 2011, following several months of due diligence and negotiations, Plaintiffs and PNC executed a loan commitment letter (the "March 2011 Loan Commitment") in which PNC "present[ed] a commitment to provide the senior secured financing of up to $27,500,000.00." (Compl. Ex. D at 1 [ECF No. 1-2]; *see also* Def.'s SMF ¶ 10; Pls.' SMF ¶ 10). The March 2011 Loan Commitment expressly reminded Plaintiffs that PNC's proposed $27.5 million Revolving Credit Facility was subject to a Borrowing Base that would limit the amount of credit available to Plaintiffs, and that the amount of this Borrowing Base was calculated using two primary data points, Plaintiffs' AR and inventory. (*See* Compl. Ex. D at 4–5; *see also* Def.'s

---

to support the assertion. To the extent any party fails to direct the Court to the record evidence in support of its asserted facts (or its reasons for disputing an opposing party's asserted facts), the Court does not consider those assertions in deciding the Motion. *See* Fed. R. Civ. P. 56(e)(4).

SMF ¶ 11; Pls.' SMF ¶ 11).

Additionally, the March 2011 Loan Commitment advised Plaintiffs they would be subject to certain financial reporting requirements, including "monthly [BBC]s with sales and collections reported weekly." (Compl. Ex. D at 9). The March 2011 Loan Commitment also reduced the minimum Excess Loan Availability requirement from $3.5 million to $2.75 million as a condition precedent for PNC to close the Loan. (*See id.* at 8; *see also* Def.'s SMF ¶ 12; Pls.' SMF ¶ 12).

On March 4, 2011, PNC sent Plaintiffs' Controller, Vaughn Potter ("Mr. Potter"), a Prefund Planning Document (the "March 2011 Instructions") in which PNC advised Plaintiffs:

> The Prefund Exam is scheduled to start on Monday, March 14[th]. . . . The primary purpose of the exam will be to compile your initial Borrowing Base Certificate (BBC). Thereafter, you will be updating your BBC and submitting ancillary information as follows:
>
> - AR Sales, Collections, Credits and Adjustments will be reported once each week (by Tuesday AM for the prior week).
>
> *      *      *
>
> - Inventory changes will be updated once each month (by the 15th of the subsequent month).
>
> *      *      *
>
> The February 2011 AR and AP agings and the February 2011 inventory reports will be used as a starting point for the initial BBC. . . . The February 2011 AR will then be updated (for sales, collections, credits, etc.) through the week ended Friday, March 11th (assuming a Friday weekly closing). Once the initial BBC is developed you should begin to submit your reports according to the above schedule even though the loan closing may not occur for a few more days.

(Feb. 12, 2013 Notice of Filing, Ex. 5 at 2; *see also* Def.'s SMF ¶ 13; Pls.' SMF ¶ 13). Upon receipt of the March 2011 Instructions, Mr. Potter forwarded the March 2011 Instructions to his Assistant Controller, Miriam Noa ("Ms. Noa"). (*See* Feb. 12, 2013 Notice of Filing, Ex. 6 at 2 Def.'s SMF ¶ 15; Pls.' SMF ¶ 15). Ms. Noa was the person at Dantzler tasked with the responsibility of preparing the BBC. (*See* Compl. ¶ 39; *see also* Def.'s SMF ¶ 15; Pls.' SMF ¶

15).

When PNC provided Plaintiffs with the March 2011 Instructions, the parties planned to close the Loan in March 2011.[3]  (*See* Sept. 28, 2012 Godinez Dep. 199:14–16 [ECF No. 91]; *see also* Def.'s SMF ¶ 16; Pls.' SMF ¶ 16).  However, because of issues arising from another bank's prior-in-time UCC lien claim that would have had priority over PNC's lien on Plaintiffs' collateral, the closing of the parties' Loan was delayed until April 2011.  (*See* Sept. 28, 2012 Godinez Dep. 199:14–25; *see also* Def.'s SMF ¶ 17; Pls.' SMF ¶ 17).

### B. Preparation of the BBCs (April 2011)

On April 19, 2011, PNC approved the new credit offering which would remain valid for ninety days.  (*See* Dec. 20, 2012 Kosis Dep. 178:9–179:6 [ECF No. 88-1]; *see also* Pls.' SMF ¶ 52).  Michael Bloomenfeld ("Mr. Bloomenfeld"), PNC's Regional Manager, was unaware of any reason why the Dantzler Deal needed to close by the end of April 2011.  (*See* Pls.' SMF ¶ 52; Nov. 27, 2012 Bloomenfeld Dep. 155:5–156:19 [ECF No. 114-2]).[4]  Nevertheless, on the afternoon of April 20, PNC's transactional counsel, Lea Johnson ("Ms. Johnson"), urged Dantzler to close the Loan by April 28, 2011.  (*See* Mar. 22, 2013 de Ojeda Dep. 239:17–241:8 [ECF No. 114-6]; *see also* Pls.' SMF ¶ 52).

Later in the afternoon on April 20, 2011, Ms. Noa e-mailed Ms. de Ojeda Plaintiffs'

---

[3] Danztler asserts "PNC expected to close on Monday, March 14th" (Pls.' SMF ¶ 51 (citing Feb. 12, 2013 Notice of Filing, Ex. 5)); however, the March 2011 Instructions state "[t]he Prefund Exam is scheduled to *start* on Monday, March 14th," and continues, "[o]nce the initial BBC is developed you should begin to submit your reports according to the above schedule *even though the loan closing may not occur for a few more days*" (Feb. 12, 2013 Notice of Filing, Ex. 5, at 2 (emphasis added)).  Consequently, the March 2011 Instructions insinuate a March closing within a few days of the initial BBC prepared on March 14, but do not indicate an expectation to close on March 14.  Dantzler's contrary assertion is not supported by the record.

[4] Mr. Bloomenfeld participated in two depositions, on November 27, 2012 and February 28, 2013.  The dates of the depositions are provided for clarity.

month-end BBC for March 31, 2011.  (*See* Feb. 12, 2013 Notice of Filing, Ex. 7; *see also* Def.'s SMF ¶ 18; Pls.' SMF ¶ 18).  Ms. de Ojeda replied on the same day, with a copy to Mr. Godinez, stating, "On the 26th or 27th (day before the closing) you only need to update the sales and collections.  Unless you wish to update the ineligibles as well (it is up to you)."  (Feb. 12, 2013 Notice of Filing, Ex. 8; *see also* Def.'s SMF ¶ 19; Pls.' SMF ¶ 19).

On April 25, 2011, PNC requested GE Capital, Dantzler's former lender, issue an updated payoff amount for Dantzler's prior loan balance.  (*See* Mar. 22, 2013 Notice of Filing, Ex. 12 [ECF No. 114-11]; *see also* Pls.' SMF ¶ 54).  The following day, Ms. de Ojeda wrote to Mr. Godinez, "Can you please try to put some pressure on your lawyers?  It would be ideal if we could fund tomorrow."  (Mar. 22, 2013 Notice of Filing, Ex. 7 [ECF No. 114-8]; *see also* Pls.' SMF ¶ 55).

On the morning of Wednesday, April 27, 2011, Ms. de Ojeda e-mailed two employees of PNC to alert them that the March 31 BBC had not yet been uploaded "into the system" for funding, despite her having sent it six days earlier.  (*See* Mar. 22, 2013 Notice of Filing, Ex. 13 [ECF NO. 114-11]; *see also* Pls.' SMF ¶ 55).  Less than fifteen minutes later, Ms. de Ojeda e-mailed Ms. Noa, with a copy to Mr. Godinez, instructing Ms. Noa to "[p]lease update [the] borrowing base as of yesterday (sales and collections only is fine) and send it to me so we can use it for funding tomorrow."  (Feb. 12, 2013 Notice of Filing, Ex. 9; *see also* Def.'s SMF ¶ 20; Pls.' SMF ¶ 55).  Five minutes later, Ms. Noa replied, "Sales and collections from 4/16 to yesterday correct?"  (Mar. 22, 2013 Notice of Filing, Ex. 14; *see also* Pls.' SMF ¶ 55).  Ms. de Ojeda did not respond.  (*See* Pls.' SMF ¶ 55).

A little more than two hours later, Ms. Noa delivered the BBC with "sales and collections updated" through Tuesday, April 26, noting that Dantzler Trade sales and collection were not yet

complete, but that "[a]ny excess availability will be sent to PNC." (Mar. 22, 2013 Notice of Filing Ex. 15 [ECF No. 114-9]; *see also* Pls.' SMF ¶ 55).[5] Thereafter, Ms. de Ojeda sent the BBC delivered by Ms. Noa to Ms. Loprete at PNC for upload to the system in preparation for funding. (*See* Mar. 22, 2013 Notice of Filing Ex. 16; *see also* Pls.' SMF ¶ 55, Def.'s SMF ¶ 22). Notably, the BBC did not include the GE Capital loan balance or closing costs. (*See id.*).

Ms. Noa acknowledged Ms. de Ojeda's instructions to her regarding the inventory information required to be set forth in the BBC in the above-referenced e-mails — specifically that Ms. Noa need not update Plaintiffs' inventory information on the BBC with current April 2011 numbers — was consistent with the formula and instructions set forth in PNC's March 2011 Instructions. (*See* Sept. 18, 2012 Noa Dep. 190:7–23 [ECF No. 92-2]).

On the evening of April 27, 2013, PNC and its counsel received the GE Capital payoff figures previously requested. (*See* Mar. 22, 2013 Notice of Filing Ex. 17). Shortly after receiving the GE Capital payoff figures, Ms. de Ojeda wrote the following to Mr. Bloomenfeld:

> I have not discussed with [Mr. Godinez], but just got the pay off letter and based upon the BBC I got today we are short for the $2.7 [million] requirement. The payoff to GE including accrued interest, fees, etc. is $24,686,433.32 and the borrowing base is $26,852,842 = $2,166,409 (we still have to take out A/P over 60 days, and closing costs).
>
> aahhhh what do we do?

(Mar. 22, 2013 Notice of Filing Ex. 18).

A few minutes later, Ms. de Ojeda e-mailed Mr. Godinez attaching a copy of the GE Capital Assignment and Acceptance Agreement indicating the payoff amount of the GE Capital loan, and wrote:

---

[5] Dantzler incorrectly attributes this statement to Exhibit 10, when it is actually from Exhibit 15. Moreover, the various exhibits — consisting of over four hundred pages — attached to the March 22, 2013 Notice of Filing [ECF No. 114] are not attached in the order provided in the Notice of Filing. As a result, the Court provides the ECF Number which accurately contains the cited information for easier reference.

[Mr. Godinez],

Based on the borrowing base I got this morning and the below pay-off figures we are not meeting the $2.7 [million] closing requirement.  Do you think if you re-do the ineligibles and inventory it will be better ([Ms. Noa] used the 3/31 ineligibles and inventory)[?]

(Mar. 22, 2013 Notice of Filing Ex. 17) ("April 27 E-mail").

Mr. Bloomenfeld responded to Ms. de Ojeda, "You have to be kidding me!  This is unbelievable[.]  We will have to discuss with [Mr. Godinez] first thing in the morning."  (Mar. 22, 2013 Notice of Filing Ex. 19).  Ms. de Ojeda replied, "[Ok], I sent him an email hopefully he will look at it first thing.  The ineligibles and inventory are from 3/31 maybe if they roll them forward they'll be better."  (Mar. 22, 2013 Notice of Filing Ex. 19).  PNC did not call Mr. Godinez to discuss Plaintiffs' inventory or any availability shortfall.  (*See* Sept. 28, 2013 Godinez Dep. 110:13–111:13).  In his deposition, Mr. Bloomenfeld expressed he would expect Ms. de Ojeda to wait for a response to her e-mail requesting updated inventory and ineligibles before closing.  (*See* Feb. 28, 2013 Bloomenfeld Dep. 48:21–50:10 [ECF No. 114-3]).

In another deposition, Mr. Bloomenfeld agreed PNC will generally not close a loan unless PNC is satisfied with the information provided by the customer, and further testified a prospective customer cannot unilaterally decide what information to provide to PNC.  (*See* Nov. 27, 2012 Bloomenfeld Dep. 46:10–47:11 [ECF No. 114-1]).  Mr. Bloomenfeld further agreed live collateral information — that is, information affecting the assets of the company including accounts receivable, inventory, machinery, equipment, and other information — is preferable to old collateral information.  (*See id.* 50:4–7, 98:9–11).

The next day, April 28, 2011, in response to Ms. de Ojeda's e-mail to Mr. Godinez (on which Ms. Noa was copied), Ms. Noa wrote, "I just finished the BBC for Dantzler Trade and we have $400,000.00 available that was sent to SunTrust Bank.  That should be part of PNC

availability for today." (Mar. 22, 2013 Notice of Filing Ex. 20). Almost two hours later, Ms. Noa sent Ms. de Ojeda an e-mail with the "BBC as of 4/27/11." (Feb. 12, 2013 Notice of Filing Ex. 13). The attached BBC ("April 27 BBC") was signed by both Ms. Noa and Mr. Godinez, and used Plaintiffs' updated AR sales and collection information through April 27, 2011 and Plaintiffs' prior month-end inventory information through March 31, 2011. (*See id.*). In addition, the April 27 BBC prepared by Ms. Noa included a figure for the payoff of the GE Capital loan of $24,353,798.94, but failed to include any information regarding the fees and costs associated with the Loan closing. (*See id.*). Ultimately, the April 27 BBC stated Plaintiffs' Excess Loan Availability was $970,132.87. (*See id.*).

Less than an hour later, Ms. de Ojeda sent an e-mail to Mr. Godinez and copied Ms. Noa attaching a draft disbursement letter that identified the total disbursements to be made under the Loan at closing as $24,839,138.16, which included $24,686,433.32 as the payoff of the GE Capital loan and over $150,000.00 in additional closing fees and costs. (*See* Feb. 12, 2013 Notice of Filing Ex. 14).

Earlier that day, Ms. Noa forwarded Ms. De Ojeda's April 27 -mail to Mr. Potter. (Feb. 12, 2013 Notice of Filing Ex. 12). According to their depositions, both Mr. Godinez and Mr. Potter expected Ms. Noa, as Plaintiffs' assistant controller responsible for preparing the BBCs, to check Plaintiffs' updated inventory information for the current month (April 2011) in response to Ms. de Ojeda's April 27 e-mail. (*See* Sept. 28, 2012 Godinez Dep. 128:14–130:2 ("Well, I hope so, I hope she had enough brains to answer it."); Dec. 13, 2012 Potter Dep. 105:12–109:21 [ECF No. 90-1] (testifying that he would have expected Ms. Noa to update Plaintiffs' inventory information on the Closing BBC in response to Ms. de Ojeda's April 27 e-mail)).

Ms. Noa, however, asserted at her deposition that she did not check Plaintiffs' updated

inventory information for April 2011 because the e-mail was not sent to her, she was merely copied on it, and she was not expressly asked by Mr. Godinez or Ms. de Ojeda.  (*See* Sept. 18, 2012 Noa Dep. 133:5–137:13).  Ms. Noa explained if she had been asked for the information, she would have provided it.  (*See id.*).  Additionally, Ms. Noa explained in every closing she had participated in prior to PNC, the lending institution had requested a full reporting before closing.  (*See* Sept. 18, 2012 Noa Dep. 188:7–189:2).  Similarly, in various other closings involving Ms. de Ojeda, PNC relied on closing BBCs with AR, sales, collections, inventory, and ineligibles from the same date, rather than from two different dates.  (*See* Dec. 20, 2012 Kosis Dep. 204:14–214:19; *see also* Pls.' SMF ¶ 72).

While acknowledging the bank's principal role in determining what information must be updated, Mr. Potter acknowledged that by not updating Plaintiffs' month-end March 2011 inventory data on the BBC with current April 2011 data, the Closing BBC was overstating Plaintiffs' current inventory numbers, the Borrowing Base, and the Excess Loan Availability on the day of the closing.  (*See* Dec. 13, 2012 Potter Dep. 36:7–40:22, 79:7–80:1, 85:14–89:6; *see also* Pls.' SMF ¶ 45; Def.'s SMF ¶ 45).  Mr. Potter further admitted his understanding that PNC was "waiving" the $1.25 million Excess Loan Availability requirement by instructing Plaintiffs not to update their month-end March 2011 inventory data on the Closing BBC with current information from April 2011.  (Dec. 13, 2012 Potter Dep. 85:14–89:6; *see also* Pls.' SMF ¶ 46; Def.'s SMF ¶ 46).  Conversely, Mr. Godinez recognized the difficulty in determining inventory figures during a particular month from looking solely at the sales and collections figures; as an example, Mr. Godinez agreed that even with five million dollars in sales in a particular month, Plaintiffs' inventory could have still *increased* from the prior month.  (*See* Sept. 28, 2012 Godinez Dep. 20:11–22:15; *see also* Pls.' SMF ¶ 48; Def.'s SMF ¶ 48).  According to Mr.

Godinez, Plaintiffs' inventory is "all over the place."  (Sept 28, 2012 Godinez Dep. 22:15; *see also* Pls.' SMF ¶ 48; Def.'s SMF ¶ 48).

Later during the afternoon of April 28, Ms. Noa sent an updated BBC to Ms. de Ojeda. (*See* Feb. 12, 2013 Notice of Filing Ex. 15).  The only change in this BBC, which had not yet been signed by either Ms. Noa or Mr. Godinez, was that Ms. Noa had reduced the GE Capital loan payoff from $24,353,798.94 to $24,067,312.97 (while still failing to include any of the closing fees and costs), thereby increasing the Excess Loan Availability from $970,132.87 to $1,256,618.84.  (*See id.*).  Ms. de Ojeda promptly responded, "I think you sent me the wrong one.  The ineligibles and inventory look the same."  (Feb. 12, 2013 Notice of Filing Ex. 16).  In reply Ms. Noa wrote, "I did not make any changes to those two lines.  The ineligibles only changed by $28,000.00 over all."  (*Id.*).  Meanwhile, Mr. Bloomenfeld e-mailed Ms. de Ojeda and others from PNC later that evening explaining their CEO, Mr. Kosis, "was okay with approximately a $150[,000.00] shortfall to our opening availability requirement of $2,750[,000.00]," and to update the payoff letter from GE Capital in the morning.  (Mar. 22, 2013 Notice of Filing Ex. 21).

On the morning of April 29, 2011, Ms. de Ojeda sent Mr. Godinez an e-mail attaching a new copy of the GE Capital Assignment and Acceptance Agreement showing that the payoff of the GE Capital loan was $24,228,538.27, and advising Mr. Godinez to:

> [p]lease review the revised pay-off letter and sign.  It is month end so we got [sic] to get this to the loan processor as soon as possible.  We are still a bit short on the hurdle but [Ms. Noa] is looking at a new borrowing base (hopefully that takes care of it).  [Mr. Kosis][6] allowed us to be $150,000[.00] short so we just got [sic] to cover another $130,000[.00].

(Feb. 12, 2013 Notice of Filing Ex. 17).  Mr. Godinez understood this e-mail to mean that there

---

[6] Peter Thompson, Mr. Bloomenfeld's supervisor, actually spoke to Mr. Kosis and obtained approval of the shortfall.  (*See* Feb. 28, 2013 Bloomenfeld Dep. 53:2–4).

was a minimal burden to close. (*See* Sept. 28, 2012 Godinez Dep. 141:8–23). Within the hour, Ms. Noa sent Ms. de Ojeda the BBC ("Closing BBC") used to qualify Dantzler for the Loan, which was unsigned and did not include closing costs.[7] (*See* Mar. 22, 2013 Notice of Filing Ex. 24). The Closing BBC indicated a payoff amount of $23,942,669.11 for the GE Capital loan, and remaining loan availability of $1,549,887.69 (after applying a $1,500,000.00 block). (*See id.*). The total Borrowing Base was $26,992,556.80. (*See id.*). A copy signed by both Ms. Noa and Mr. Godinez was sent about an hour later. (*See* Feb. 12, 2013 Notice of Filing Ex. 19).

At around the same time, the PNC employees involved in the Loan had reconciled all of the numbers for disbursement and learned Dantzler was approximately $139,000.00 short from the required opening availability of $2,750,000.00; however, since Mr. Kosis had indicated a shortfall of up to $150,000.00 was acceptable, the $139,000.00 gap was not a "hurdle" to closing. (*See* Mar. 22, 2013 Notice of Filing Ex. 30). The $139,000.00 gap was based on the Closing BBC indicating a total Borrowing Base of $26,992,556.80, and total disbursements (including the updated GE Capital payoff amount and closing costs) of $24,381,243.11. (*See id.*). Mr. Bloomenfeld claimed he was unaware of anyone at PNC approving a shortfall in excess of $150,000.00 on the Loan. (*See* Feb. 28, 2013 Bloomenfeld Dep. 53:5–57:12). Shortly thereafter, Mr. Godinez indicated he was ready to close, and Ms. de Ojeda forwarded Mr. Godinez's acceptance to Mr. Bloomenfeld. (*See* Mar. 22, 2013 Notice of Filing Ex. 27).

Later that afternoon, after Mr. Godinez approved the decision to close the Loan, a revised disbursement letter was completed and sent from Ms. Johnson to Mr. Godinez, Mr. Potter, and another individual, which added a $100,000.00 ExIm fee and a $100.00 application fee, bringing

---

[7] Mr. Godinez later testified he was unaware the closing costs were not part of the borrowing base he saw in the Closing BBC. (*See* Sept. 28, 2013 Godinez Dep. 145:14–148:14). Mr Godinez also testified he understood the final payoff amount to be the approximately $23,900,000.00 figure reflected in the Closing BBC. (*See id.* 149:9–151:20).

the total disbursements to $24,481,343.11.  (*See* Mar. 22, 2013 Notice of Filing Ex. 29).  When the Loan finally closed, the $1,549,887.69 Excess Loan Availability figure reflected on the Closing BBC was incorrect as the Closing BBC included a figure for the payoff of the GE Capital loan understated by over $285,000.00, and failed to include any of the closing fees and costs (approximately an additional $252,000.00).  (*See* Feb. 12, 2013 Jay Stein Aff. ¶¶ 9–12 [ECF No. 95]).  Moreover, Dantzler's previous $139,000.00 shortfall calculated by PNC (including the updated and accurate GE Capital payoff amount) had not accounted for the additional $100,100.00 in closing costs added in the final disbursement letter.  (*See* Mar. 22, 2013 Notice of Filing Ex. 29).  Consequently, the shortfall exceeded the original estimate of $139,000.00, as well as the previously authorized $150,000.00.

### C. Execution of the Loan Agreement (April 29, 2011)

In the process of closing on a loan, it is a PNC auditor's job to instruct prospective borrowers on how to prepare PNC's proprietary BBC.  (*See* Nov. 27, 2012 Bloomenfeld Dep. 88:6–24, 89:3–17; *see also* Pls.' SMF ¶ 71).  Ms. de Ojeda acknowledged it is not her job to provide borrowers with instructions on preparing test BBCs leading up to closing.  (*See* Aug. 24, 2012 de Ojeda Dep. 50:22–51:8; *see also* Pls.' SMF ¶ 71).  Ms. de Ojeda further stated she did not know how to prepare a BBC.  (*See* Aug. 24, 2012 de Ojeda Dep. 59:4–15; *see also* Pls.' SMF ¶ 71).  Mr. Bloomenfeld agreed a Business Development Officer, like Ms. de Ojeda, should have very little role in determining what collateral should be reported in anticipation of funding.  (*See* Nov. 27, 2012 Bloomenfeld Dep. 93:4–21; *see also* Pls.' SMF ¶ 71).  Nevertheless, Mr. Bloomenfeld testified he would be surprised if his business development officers did not know how to prepare a BBC.  (*See* Nov. 27, 2012 Bloomenfeld Dep. 152:9–12).

According to PNC, before closing on the Loan, it fully understood the Closing BBC

understated the GE Capital loan payoff amount by over $285,000.00 and failed to include any of the closing fees and costs (which were to be part of the initial disbursement). (*See* Feb. 12, 2013 Jay Stein Aff. ¶¶ 3–12). Additionally, Ms. Noa admitted at her deposition that she understood when she signed the Closing BBC there were additional closing costs that were not included; and as such, Plaintiffs' stated Excess Loan Availability of $1.549 million was "not the number." (Sept. 18, 2012 Noa Dep. 190:24–193:15).

Nevertheless, Mr. Kosis testified if PNC was presented with the BBC from May 2, 2011, PNC would not have closed as Dantzler would not have qualified for the Loan. (*See* Dec. 20, 2012 Kosis Dep. 232:25–233:11 [ECF No. 88-2]). Moreover, Mr. Kosis suggested that had he known the inventory report used for closing was that "far off," he would have raised the question. (*Id.* 235:14–236:1). Mr. Kosis conceded PNC should "have checked [Dantzler's] borrowing base that they submitted, even though they signed off on it, and we should have seen the closing costs on the . . . borrowing base where those were . . . put in so that that would have been a more accurate availability on that date. That's a mistake that we missed." (*Id.* at 237:11–17). Additionally, Ms. de Ojeda stated she and the Dantzler Deal Team "had deal fatigue" as a result of the length of time it had taken to complete the transaction. (August 24, 2012 de Ojeda Dep. 203:10–24 [ECF No. 114-6]). Mr. Bloomenfeld agreed the entire Dantzler Deal Team "probably had deal fatigue." (Nov. 27, 2012 Bloomenfeld Dep. 160:13–161:6 [ECF No. 114-2]).

According to Mr. Kosis, the minimum availability requirement for new customers is important because PNC does not "want a client coming out of the gate with no cash availability." (Dec. 20, 2012 Kosis Dep. 93:17–22 [ECF No. 88-1]). Mr. Kosis, Mr. Bloomenfeld, and Ms. de Ojeda all acknowledged PNC's policy of generally maintaining ten percent availability — as a rule of thumb — for a company operating under a loan. (*See id.* 122:1–126:9; Nov. 27, 2012

Bloomenfeld Dep. 70:9–71:9 [ECF No. 114-1]; Aug. 24, 2012 de Ojeda Dep. 275:8–16).

On April 29, 2011, in reliance on the Borrowing Base set forth in the Closing BBC, the parties executed the Loan Agreement and closed the Loan.  (*See* Compl. ¶ 48 Ex. A; *see also* Def.'s SMF ¶ 39; Pls.' SMF ¶ 39).  The parties' Loan Agreement provides:

ARTICLE VIII

CONDITIONS PRECEDENT

8.1 *Conditions to Initial Advances*

The Agreement of Lenders to make the initial Advances requested to be made on the Closing Date is subject to satisfaction, or waiver by [PNC], immediately prior to or concurrently with the making of such Advances, of the following conditions precedent:

*       *       *

(w)  Undrawn Availability.

After giving effect to the initial Advances hereunder, [Dantzler] shall have Undrawn Availability of at least $2,750,000[.00] (including the availability block set forth in Section 2.1(a)(iv));

(Compl. Ex. A at 80–82; *see also* Def.'s SMF ¶ 40; Pls.' SMF ¶ 40).  The Loan Agreement does not specify the frequency with which inventory or AR should be updated, only that it should be calculated in a "form acceptable to PNC."  (Aug. 24, 2012 de Ojeda Dep. 96:23–97:17; *see also* Pls.' SMF ¶ 70).  Mr. Bloomenfeld testified neither any "form agreement" nor the Loan Agreement contained information regarding required collateral reporting.  (Nov. 27, 2012 Bloomenfeld Dep. 114:1–23).  Mr. Bloomenfeld indicated the Loan Agreement was vague with respect to any collateral reporting requirements "by design".  (*Id.* at 116:9–119:5).

**D. After Closing (May 2, 2011 and After)**

For purposes of determining their ongoing Excess Loan Availability after closing and in accordance with the formula provided in the March 2011 Instructions, Plaintiffs were required to

update their sales and collections information weekly by the Tuesday of the following week, and to update their inventory information monthly by the fifteenth day of the following month.  (*See* Feb. 12, 2013 Stein Aff. ¶ 13 [ECF No. 95]; *see also* Def.'s SMF ¶ 41; Pls.' SMF ¶ 41). Nevertheless, on Monday, May 2, 2011, Ms. Noa prepared and submitted to PNC a new BBC (the "May 2 BBC").  (*See id.* at ¶ 14, Ex. B; *see also* Def.'s SMF ¶ 42; Pls.' SMF ¶ 42).  In the May 2 BBC, Ms. Noa updated Plaintiffs' AR data through the end of the prior week, April 29, 2011, as she was required to do by PNC.  (*See id.*).  In addition, Ms. Noa updated Plaintiffs' inventory data through month-end April 2011, although PNC did not require such an update until May 15, 2013.  (*See id.*).  According to Ms. Noa, updating everything on the first of the month was important because it allowed Dantzler to close out the previous month and balance the financial data.  (*See* Sept. 18, 2012 Noa Dep. 80:20–82:4; *see also* Def.'s SMF ¶ 43; Pls.' SMF ¶ 76).  Ms. Noa's practice developed after years of experience working with GE Capital, and was permitted by PNC.  (*See id.*).  PNC agreed Ms. Noa was not prohibited from updating the monthly inventory data on the first day of the month.  (*See* Stein Aff. ¶ 16; *see also* Def.'s SMF ¶ 43; Pls.' SMF ¶ 43).

Upon updating the May 2 BBC, Plaintiffs' gross inventory numbers decreased from the March 2011 month-end figure of $25,515,768.21 reported on the Closing BBC to the April 2011 month-end figure of $23,259,055.15 reported on the May 2 BBC (a decrease of over $2 million). (*See* Feb. 12, 2013 Stein Aff. ¶ 15, Exs. A–B; *see also* Def.'s SMF ¶ 44; Pls.' SMF ¶ 44). Consequently, Plaintiffs' Borrowing Base decreased by approximately $700,000.00 from the $26,992,556.80 figure reflected on the Closing BBC to $26,296,990.26 on the May 2 BBC.  (*See id.*).  It also caused a corresponding $700,000.00 decrease in Plaintiffs' Excess Loan Availability on the May 2 BBC, which was now only $341,132.28.  (*See id.*).

Ms. Noa could not recall Dantzler ever having any funding issues with its prior lender GE Capital. (*See* Sept. 18, 2012 Noa Dep. 218:4–219:19; *see also* Pls.' SMF ¶ 50). Additionally, PNC had conducted pre-fund audits and a survey examination to investigate Dantzler's credit, including Dantzler's financial reporting capabilities and market operations. (*See* Aug. 24, 2012 de Ojeda Dep. 160:19–24, 164:10–15, 166:3–25; *see also* Pls.' SMF ¶ 50). The Offering Memorandum details Dantzler's past AR, inventory, and availability, showing fluctuations in Dantzler's inventory. (*See generally* March 22, 2013 Notice of Filing Ex. 5; *see also* Pls.' SMF ¶ 50). In total, PNC had worked for more than seven months with Dantzler to close the Loan. (*See* Sept. 28, 2012 Godinez Dep. 80:10–81:15; *see also* Pls.' SMF ¶ 50). In the ensuing relationship Dantzler struggled in its daily operations, including challenges meeting payroll and being late on payments to suppliers. (*See* Sept. 18, 2012 Noa Dep. 250:15–251:2, 257:9–258:1; *see also* Pls.' SMF ¶ 77). There were numerous instances when Dantzler was overdrawn or had near zero availability. (*See* Sept. 18, 2012 Noa Dep. 270:14–271:25; *see also* Pls.' SMF ¶ 77).

## II.  LEGAL STANDARD

Summary judgment shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a), (c). "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks

omitted)).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Channa Imps., Inc. v. Hybur, Ltd.*, No. 07-21516-CIV, 2008 WL 2914977, at *2 (S.D. Fla. Jul. 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation marks and alterations in original omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## III.  ANALYSIS

In its Motion, PNC argues summary judgment should be entered in its favor on Dantzler's two misrepresentation claims (fraudulent inducement and negligent misrepresentation) as well as the mutual mistake claim.  The Court addresses each argument successively.

## A.    The Misrepresentation Claims

In Counts I and II of the Complaint, Dantzler asserts two misrepresentation claims in connection with the Loan closing — fraudulent inducement and negligent misrepresentation. The essential elements of a claim for fraudulent inducement are: "(1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied[8] on the false statement to its detriment."  *Rose v. ADT Sec.*

---

[8] The Court notes the Florida Supreme Court has held, "Justifiable reliance is not a necessary element of fraudulent misrepresentation."  *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).  The relevant element of

*Servs., Inc.*, 989 So. 2d 1244, 1247 (Fla. 1st DCA 2008) (citing *Simon v. Celebration Co.*, 883

So. 2d 826, 832 (Fla. 5th DCA 2004)) (footnote added).[9]

> A plaintiff asserting a cause of action for negligent misrepresentation must establish:
>
> "(1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false; (2) the defendant was negligent in making the statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely . . . on the misrepresentation; and (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation."

*Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 309 (Fla. 1st DCA 2011)

(quoting *Simon v. Celebration Co.*, 883 So. 2d 826, 832 (Fla. 5th DCA 2004)) (citation omitted).

In support of summary judgment on the misrepresentation claims, PNC asserts: (1) the

parties agreed to the formula used to prepare the BBC; (2) Dantzler concedes the directions

received were consistent with the agreed-upon formula and were not false or misleading; (3) Ms.

de Ojeda expressly disclosed inventory figures from March 2011 were being used to close the

Loan and requested Dantzler provide current April 2011 data; (4) Dantzler knew it was

overstating the current inventory on the Closing BBC and further knew the loan availability

would decrease as soon as it updated the inventory data; and (5) the parties knew the Excess

Loan Availability reflected in the Closing BBC was overstated but PNC had waived the Excess

Loan Availability condition precedent.

---

the claim only requires "consequent injury by the party acting in reliance on the representation," and not justifiable reliance.  *Id.* (emphasis, citation, and internal quotation marks omitted).  As the parties' arguments do not hinge on this distinction, the Court does not decide whether justifiable reliance is necessary.  Additionally, the Court notes this distinction does not apply to negligent misrepresentation claims.  *See id.* ("The same reasoning does not apply, however, when a party transmits false information but is not aware of the falsehood, giving rise to a negligent misrepresentation claim." (citation omitted)).

[9] "'In diversity cases, a federal court applies the law of the forum in which it sits.'"  *Clifford v. Commerce Ins. Co.*, No. 09-21198, 2009 WL 3387737, at *1 (S.D. Fla. Oct. 16, 2009) (quoting *Broyles v. Bayless*, 878 F.2d 1400, 1402 (11th Cir. 1989)).  As such, Florida law applies to this action.  *See Cruz v. Navy Fed. Fin. Group LLC*, No. 309-CV-533-RV-EMT, 2010 WL 617387, at *3–4 (N.D. Fla. Feb. 17, 2010) (applying Florida law to a case involving claims for negligent misrepresentation and fraud in the inducement).  Neither party disputes the application of Florida law in this matter.

### 1.      BBC Formula

PNC contends summary judgment is appropriate as the parties agreed to a formula using updated AR data for the current month and inventory data from the prior month to prepare the BBC.  (*See* Mot. 11).   Specifically, prior to the Loan's closing, PNC's audit manager sent Dantzler the March 2011 Instructions and Dantzler never objected to the proposed formula.  (*See id.* 11–13).   Thus, PNC argues, by acquiescing to the proposed formula, Dantzler implicitly agreed to the formula using March 2011 inventory data on the Closing BBC.  (*See id.* 13).   PNC concludes its agents could not have made a false statement of material fact by providing and adhering to a formula Dantzler subsequently agreed to and adopted.  (*See id.* 10–11).

Dantzler argues the Loan Agreement contains a merger and integration clause, but does not contain any information regarding the preparation of a closing BBC; rather, PNC's employees characterized the Loan Agreement's provisions regarding collateral reporting requirements as flexible.  (*See* Resp. 9).   Notwithstanding the Loan Agreement's conceivable preclusion of pre-closing representations, Dantzler asserts Ms. de Ojeda's instructions were not consistent with the March 2011 Instructions.  (*See id.*).   PNC nevertheless insists Dantzler's receipt of the March 2011 Instructions provides "undisputed evidence" the parties agreed on the formula, and such evidence is properly admitted parol evidence since the Loan Agreement is silent or ambiguous regarding collateral reporting requirements.  (Reply 3–4 (citing *Fabian v. Ryan*, 486 So. 2d 10 (Fla. 3d DCA 1986) (additional citations omitted)).

Preliminarily, PNC does not provide support for its assertion that a misrepresentation claim can be defeated if a party acquiesces to the misrepresentation at issue.  Even so, PNC's argument requires the Court to resolve whether Dantzler's failure to object establishes Dantzler's intent to agree to the proposed formula.  Such questions of intent ordinarily preclude summary

judgment as factfinders are permitted to look to all the surrounding circumstances to infer intent. *See Cohen v. Kravit Estate Buyers, Inc.*, 843 So. 2d 989, 991 (Fla. 4th DCA 2003) ("In fraud cases, summary judgment is rarely proper as the issue so frequently turns on the axis of the circumstances surrounding the complete transaction, including circumstantial evidence of intent and knowledge." (citation omitted)).  Moreover, PNC hardly offers "undisputed evidence" of an agreement to use the formula as prescribed in the March 2011 Instructions.  The thrust of PNC's argument asks the Court to interpret Dantzler's lack of objection to the March 2011 Instructions as implicit agreement to the formula; yet, the record indicates even PNC did not agree to or settle on the formula used.

The March 11 Instructions provided, "AR Sales, Collections, Credits and Adjustments will be reported once each week (by Tuesday AM for the prior week). . . . Inventory changes will be updated once each month (by the 15th of the subsequent month)."  (Feb. 12, 2013 Notice of Filing, Ex. 5 at 2; *see also* Def.'s SMF ¶ 13; Pls.' SMF ¶ 13).  But in the days leading up to closing, Ms. de Ojeda instructed Dantzler to update its AR sales, collections, credits and adjustments, with sales and collections figures from the same week — in direct contravention of the purportedly agreed-upon formula.  On April 27, 2011, Ms. de Ojeda asked Ms. Noa to update "sales and collection" figures as of (specifically, up to and including) Tuesday April 26, 2011, while the March 2011 Instructions specified the figures would be updated on the Tuesday of each week for the prior week only.  (Feb. 12, 2013 Notice of Filing, Ex. 9).  Ms. Noa provided the requested figures updated through April 26, 2011, and they served as the sales and collections figures relied upon to close the Loan.  (*See* Mar. 22, 2013 Notice of Filing Ex. 15 [ECF No. 114-9]).

Additionally, Ms. de Ojeda exhibited a willingness to eschew strict adherence to the

purportedly agreed upon formula as she suggested updating inventory again before closing.  In an effort to meet the closing requirement, Ms. de Ojeda asked Mr. Godinez in the April 27 e-mail, "Do you think if you re-do the ineligibles and inventory it will be better ([Ms. Noa] used the 3/31 ineligibles and inventory)[?]"  (Mar. 22, 2013 Notice of Filing Ex. 17).  The e-mail indicates Ms. de Ojeda at least contemplated using inventory figures in contravention of the March 2011 Instructions.

Moreover, Mr. Bloomenfeld acknowledged the collateral reporting requirements were left intentionally vague in the Loan Agreement to give "room and interpretation to make sure that the bank is receiving the information it needs in form and substance satisfactory to [the bank]".  (Nov. 27, 2012 Bloomenfeld Dep. 118:18–119:5).  Ms. de Ojeda confirmed the Loan Agreement does not specify the frequency with which inventory or AR sales should be updated, only that they should be calculated in a "form acceptable to PNC."  (*See* Aug. 24, 2012 de Ojeda Dep. 96:23–97:17; *see also* Pls.' SMF ¶ 70).  Consequently, there is evidence contradicting the notion both parties agreed to a static formula, as the actual provision of information did not adhere to the formula's specifications, and PNC admitted the reporting requirements were intentionally vague.

In sum, after viewing all the evidence and making all reasonable inferences in favor of Dantzler, the Court finds there is a disputed issue of material fact as to whether the parties actually agreed — even if by acquiescence — to the formula used in calculating the Closing BBC.  As such, it is unnecessary for the Court to determine whether acquiescence to a misrepresentation would necessarily defeat the misrepresentation claims as a matter of law.

### 2. Administration of the BBC Formula

PNC argues summary judgment should be entered in its favor on the misrepresentation

claims because Ms. de Ojeda's initial instruction to Ms. Noa regarding what inventory figures to include on the Closing BBC was not faulty or misleading, but instead was entirely consistent with the formula agreed upon by the parties. (*See* Mot. 13). As such, PNC argues the initial instruction not to update inventory was not a false statement of material fact, and without such a statement PNC is entitled to summary judgment on the misrepresentation claims. (*See id.* 14). In support of its argument, PNC relies on Ms. Noa's statement that the inventory information requested prior to closing was consistent with the March 2011 Instructions. (*See id.* 14 (citing Sept. 18, 2012 Noa Dep. 190:7–23)).

As stated, there is evidence contradicting any agreement occurred with respect to the formula used to prepare the Closing BBC, *see supra*, Part III.A.1; and PNC's present argument is contingent on an underlying agreement regarding the formula. As PNC fails to establish an agreement, PNC's second argument fails just as its first argument failed. Moreover, Ms. Noa's statement is discredited by the parties' conduct in anticipation of closing. Specifically, Ms. de Ojeda requested that Ms. Noa update sales and collection out of turn,[10] and Ms. de Ojeda appeared willing to shun the purportedly agreed-to inventory reporting requirements to increase the Excess Loan Availability. *See id.* Mr. Bloomenfeld also indicated there were no strict collateral reporting requirements and the requirements were left deliberately vague in the parties' Loan Agreement. *See id.* Accordingly, there are disputed issues of material fact as to whether the parties ever agreed to a formula, or assuming such an agreement, whether the instructions

---

[10] In its Reply Brief, PNC argues Ms. de Ojeda's instructions regarding the sales and collection data are "not the alleged factual basis of Plaintiffs' Misrepresentation Claims . . . and thus should not be considered by this Court on PNC's Motion for Summary Judgment." (Reply 5). PNC misinterprets the effect of this record evidence. Ms. de Ojeda's faulty instructions with respect to sales and collections are not being considered as evidence of an additional misrepresentation, but rather to demonstrate PNC did not abide by its own formula in other respects and therefore PNC cannot assert the existence of a set formula against Dantzler on a motion for summary judgment.

were consistent therewith.

### 3. Ms. de Ojeda's Request to Use April 2011 Inventory Data

PNC next asserts Ms. de Ojeda's two pre-closing e-mails to Dantzler disclosed the parties were using March 2011 inventory data and asked Dantzler to update the inventory information with current April 2011 data.  (*See* Mot. 15–17).  As such, PNC maintains it is entitled to summary judgment on the misrepresentation claims because Dantzler cannot recover for allegedly false misrepresentations that were ultimately corrected and/or revealed.  (*See id.* 17).

Dantzler argues the meaning of the two e-mails and their effect on Dantzler and within PNC are disputed issues of fact.  (*See* Resp. 11–12).  Dantzler further asserts an incorrect payoff amount was used for the GE Capital loan, and incorrect closing costs were also used in the Closing BBC; therefore, the Closing BBC misrepresented Dantzler's ability to qualify for the Loan in more ways than just inventory.  (*See id.* 12).  Dantzler finally contends Ms. de Ojeda's e-mails do not constitute an agreement, and Florida law precludes relief on a misrepresentation claim only when the alleged misrepresentation is expressly contradicted by the subsequent written agreement.  (*See id.*).

Although not addressed in its Reply, PNC disputes Dantzler's inclusion of potential misrepresentations in reporting closing costs and the payoff amount for the GE Capital loan.  (*See generally* Resp. to Supplemental Mem.).  At the April 10 hearing and in supplemental filings, PNC argues "these new assertions of fraud and/or mistake" should not even be considered as "they were not alleged in the Complaint and thus are not properly before the Court."  (*Id.* 5).  The Court addresses whether Dantzler's arguments are properly before the Court based on the allegations in the Complaint, and then turns to the merits of PNC's argument on this issue.

> i.      Do Dantzler's arguments fit within the scope of the Complaint?

PNC argues Plaintiffs may not amend the complaint through argument at the summary judgment phase of the proceedings.  (*See id.* (citing *GeorgiaCarry.org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012))).   PNC asserts Dantzler's arguments with respect to the closing costs and the prior loan balance are beyond the scope of the Complaint, which only alleges the inventory reporting requirements caused the misrepresentation at issue.  (*See id.* 6).  In its Supplemental Memorandum, Dantzler argues the issues raised in the Response are encompassed within the allegations of the Complaint, as the closing costs and payoff amount are interrelated to other aspects of the real misrepresentation at issue — Dantzler's Excess Loan Availability at the time of closing.  (*See generally* Supplemental Mem.).

As argued by PNC, a plaintiff may not amend the complaint through argument at summary judgment.  *See GeorgiaCarry.Org, Inc.*, 687 F.3d at 1258 n.27 (citations omitted).  Put another way, "a party may not raise a new theory for the first time in response to a summary judgment motion."  *Cruz v. Advance Stores Co., Inc.*, 842 F. Supp. 2d 1356, 1360 (S.D. Fla. 2012) (citation omitted).  Rather, the proper procedure for a plaintiff is to "amend [its] complaint in accordance with [Rule] 15(a)."  *Id.* (citation and internal quotation marks omitted).  Additionally, "Rule 8(a)'s liberal pleading standard is inapplicable once discovery has commenced."  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (citation omitted).  The defendant must be on notice of the grounds upon which the plaintiff believes it is entitled to relief.  *See id.*

Here, the Complaint contains the following general allegations with respect to Counts I and II:

> 73.  PNC created a false sense of urgency to close the loan in April of 2011 and then, as discussed herein, *provided Dantzler with false and misleading*

*directions in connection with preparation of the Closing Certificate* the last day before the scheduled closing in a manner that misrepresented and inflated the loan availability / working capital that PNC would provide.

\*          \*          \*

75. PNC knew or, at a minimum, should have known that *its instructions concerning the preparation of the Closing Certificate* would result in the generation of a Closing Certificate that would not accurately reflect the amount of funds that would be available to Dantzler upon closing and would, correspondingly, result in the generation of a Closing Certificate that inaccurately reflected the amount of funds available under the line of credit.

76. PNC provided Dantzler with the *false and misleading instructions concerning the preparation of the Closing Certificate* in order to induce Dantzler to close the Loan Agreement. . . .

77. In addition, PNC provided the *false and misleading instructions concerning the preparation of the Closing Certificate* in order to obtain additional fees that PNC would not otherwise have received in the event that the Agreement was not closed. . . .

78. Dantzler was wrongfully induced into entering into the PNC Loan with PNC and closing *based upon an inherently flawed borrowing certificate*, so that PNC could earn the remainder of the closing fees, loan servicing fees and interest, and attempt to bind Dantzler to a $275,000.00 pre-payment penalty.

79. Dantzler reasonably relied upon the *instructions / false representations* from PNC and generated a Closing Certificate that reflected that it would have access to sufficient funds upon the closing of the Agreement.

80. But for Dantzler's reliance upon PNC's *inaccurate, misleading, and fraudulent representations* concerning Dantzler's access to sufficient funds under the line of credit. Dantzler would not have closed on the Agreement.

(Compl. ¶¶ 73, 75–80 (emphasis added); *see also id.* ¶¶ 87, 89).   Dantzler also expressly

referenced the inventory instructions as follows:

74. More particularly, PNC, through [Ms.] de Ojeda, specifically directed Dantzler concerning the preparation of the Closing Certificate. The instructions that were given — specifically the instructions not to incorporate or update the inventory data in order to artificially inflate Dantzler's "unavailability" on the closing date — were false.

(Compl. ¶ 74; *see also* ¶ 88).

A review of the relevant allegations indicates Dantzler instituted the present action to recover damages suffered as a result of any instructions leading to a misrepresentation of Dantzler's Excess Loan Availability. The misrepresentation at issue is the Closing BBC, and the instructions that led to its creation, but is not limited to any particular instruction. The allegations in the Complaint plainly contemplate various statements of fact leading to an aggregate misrepresentation of Dantzler's Excess Loan Availability at closing. As the Order [ECF No. 33] on PNC's Motion to Dismiss indicated:

> The Court finds that here . . . there is a distinction between (1) alleged statements of fact that Plaintiffs qualified for the PNC Loan as of the time of closing (or as of the time the Closing Certificate was generated), by meeting specific qualification criteria; and (2) alleged opinions that Plaintiffs would continue to meet the terms of the PNC Loan, under the executed Agreement, after the time of closing. Plaintiffs base this action on the former, not the latter. They allege the source of the former statements of fact to be the instructions in connection with preparing the Closing Certificate "in a manner that misrepresented and inflated the loan availability/working capital that PNC would provide." (Compl. ¶¶ 73, 87). Plaintiffs allege these instructions, particularly not to update the inventory data, were false. (*See id.* ¶¶ 74, 88).

(April 19, 2012 Order 17; *see also id.* 24 ("Rather, [Dantzler's] claims are predicated on specific representations made as the parties prepared the Closing Certificate, regarding Plaintiffs' qualification for the PNC Loan at that specific point in time.")). PNC was certainly on notice that any statements of fact made in connection with the preparation of the Closing BBC might be grounds for relief. *See Hurlbert*, 439 F.3d at 1297. Indeed the Complaint's plain language suggests multiple instructions, representations, and directions were in dispute as evidenced by the plural use of these terms throughout. (*See* Compl. ¶¶ 73, 75–80, 87, 89).

PNC's reliance on several cases prohibiting certain arguments on motions for summary judgment is unavailing, as the cases are distinguishable from the present matter. *See GeorgiaCarry.Org, Inc.*, 687 F.3d at 1258 n.27 (citations omitted) (determining plaintiffs had taken inconsistent positions with respect to a required element of their claim, and could not

include additional facts at summary judgment to satisfy the formerly disputed element of the claim); *Cruz*, 842 F. Supp. 2d at 1360 (holding plaintiff is not permitted to raise wholly new theories of negligence on summary judgment); *Menzie v. Ann Taylor Retail, Inc.*, No. 3:11cv416/MCR/CJK, 2013 WL 709608, at *6 n.16 (N.D. Fla. Feb. 27, 2013) (finding plaintiff had not included a theory of liability in her complaint but relied on it in her summary judgment motion, and determining defendant was consequently deprived of adequate notice of claim based on this theory); *Hurlbert*, 439 F.3d at 1297 ("Hurlbert's complaint, however, provided no notice whatsoever that he believed he was entitled to [relief] on this basis."). Dantzler's misrepresentation claims are predicated on an allegedly flawed Closing BBC that, due to its faulty preparation, would not accurately reflect the amount of funds available to Dantzler, and the various instructions involved in the Closing BBC's preparation do not present novel, alternative theories of liability not previously considered, nor do they serve to satisfy elements of the claim not previously addressed. The present circumstances are materially different from the aforementioned cases.

In short, the Complaint encompasses various statements of fact involved in connection with the preparation of the Closing BBC, including, but not limited to, the appropriate inventory figures. Any other instances of faulty preparation instructions are merely the natural by-product of the discovery process. As such, the Court can properly consider the effect of the undisclosed closing costs and the varying loan payoff amount without requiring an amendment to the Complaint. PNC had adequate notice that the entire process of creating the Closing BBC was in dispute and subject to review by the parties and the Court.

    *ii.*    *Do PNC's pre-closing e-mails defeat Dantzler's misrepresentation claims?*

PNC asserts Ms. de Ojeda's two pre-closing e-mails to Dantzler revealed the parties were

using March 2011 inventory data and requested Dantzler update the inventory information with current April 2011 figures instead.  (*See* Mot. 15–17).  PNC maintains it is entitled to summary judgment on the misrepresentation claims as Dantzler cannot recover for allegedly false misrepresentations that were ultimately disclosed.  (*See id.* 17).  Dantzler argues the intention of the two e-mails is unclear and presents a disputed issue of fact.  (*See* Resp. 11–12).  Dantzler also argues an inaccurate payoff amount for the GE Capital loan and incorrect closing costs were used in the Closing BBC, which produced additional errors that ultimately produced a Closing BBC misrepresenting Dantzler's ability to qualify for the Loan.  (*See id.* 12).  Dantzler additionally maintains Ms. de Ojeda's e-mails do not establish an agreement and restates Florida law regarding misrepresentation claims and their subsequent contradiction by the later written agreement.  (*See id.*).

For justifiable reliance to support a misrepresentation claim, it must be determined "whether the recipient of the misrepresentation is justified in relying upon its truth.  For if the recipient knows that it [sic] the statement is false or its falsity is obvious to him, his reliance is improper, and there can be no cause of action for fraudulent misrepresentation."  *Rose*, 989 So. 2d at 1247 (quoting *M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 94–95 (Fla. 2002)) (alteration, citation, and internal quotation marks omitted).  Put differently, "[n]otwithstanding oral misrepresentations prior to the making of a contract, a party cannot establish justifiable reliance and may not recover in fraud for an alleged false statement when proper disclosure of the truth is subsequently revealed in a written agreement between the parties."  *Id.* (citations and internal quotation marks omitted); *see also Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542–43 (Fla. 5th DCA 2003) ("Moreover, the courts have held that a party may not recover in fraud for an alleged false statement when proper disclosure of the truth is

subsequently revealed in a written agreement between the parties." (citations omitted)).

Here, it is not clear the two e-mails disclosed the alleged falsity.  Ms. de Ojeda's first e-mail on April 27, 2011, stated:

> [Mr. Godinez],
>
> Based on the borrowing base I got this morning and the below pay-off figures we are not meeting the $2.7[million] closing requirement.  Do you think if you re-do the ineligibles and inventory it will be better ([Ms. Noa] used the 3/31 ineligibles and inventory)[?]
>
> Rocio de Ojeda

(Mar. 22, 2013 Notice of Filing Ex. 17).  And the second e-mail, drafted on April 28, 2011, and in response to receiving a revised BBC from Ms. Noa, stated, "I think you sent me the wrong one.  The ineligibles and inventory look the same."  (Feb. 12, 2013 Notice of Filing Ex. 16).  Ms. Noa replied to Ms. de Ojeda's second e-mail, "I did not make any changes to those two lines. The ineligibles only changed by $28,000.00 over all."  (*Id.*).

PNC contends the first e-mail demonstrates "PNC asked Plaintiffs to update the inventory figures on their Closing BBC with current April 2011 data (as they were doing with their AR information) in an effort to try to increase their Excess Loan Availability and thereby meet their $1.25 million Excess Loan Availability requirement."  (Mot. 16).  But there is a genuine issue of material fact concerning whether these e-mails establish a bonafide request for Dantzler to update its inventory so as to defeat Dantzler's justifiable reliance on PNC's purported misrepresentations.  The e-mails do not make a clear request, but rather suggest updating the inventory — and even solicit Dantzler's input on the subject — with the ultimate goal of increasing the Excess Loan Availability.  A reasonable fact finder might infer Ms. de Ojeda would be willing to use March or April's inventory on the Closing BBC, whichever would produce the necessary Excess Loan Availability.  *See Channa Imps., Inc.*, 2008 WL 2914977, at

*2 ("A factual dispute is genuine if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." (citation and internal quotation marks omitted)).

With respect to the second e-mail from Ms. de Ojeda and Ms. Noa's reply, PNC asserts "Ms. Noa specifically [indicated] she had made the decision not to update either the ineligibles or inventory figures . . . with current April 2011 numbers and suggested . . . updating this information would not have helped to increase Plaintiffs' Excess Loan Availability on the day of closing." (Mot. 17). Neither representation is established to the exclusion of any genuine issue of material fact because although Ms. Noa may have inferred such representations, any reasonable inferences are drawn in favor of Dantzler — and not PNC — on consideration of a motion for summary judgment. *See Chapman*, 229 F.3d at 1023 (citation omitted). It is equally reasonable to surmise that Ms. Noa understood Ms. de Ojeda's e-mail to be a suggestion, and not a directive, as it is to conclude Ms. Noa made a conscious decision to not update inventory figures after an internal review of the updated numbers (PNC's assertion). Moreover, Ms. Noa testified she did not check Plaintiffs' updated inventory information for April 2011 because the e-mail was not sent to her, she was merely copied on it, and she was not expressly asked to do so by either Mr. Godinez or Ms. de Ojeda. (*See* Sept. 18, 2012 Noa Dep. 133:5–137:13). With these contrary facts it is not clear Dantzler knew the falsity of the alleged misrepresentation.

Additionally, PNC fails to reference any facts in the record to show there is no genuine issue of material fact concerning PNC's alleged misrepresentations of the closing costs and GE Capital loan payoff amount. Although Ms. Noa admitted when she signed the Closing BBC she knew there were additional closing costs not included, and the Excess Loan Availability shown was "not the number" (Sept. 18, 2012 Noa Dep. 190:24–193:15), it is unclear whether Dantzler knew just how short of the required Excess Loan Availability it would ultimately close at.

Furthemore, Mr. Godinez testified he was unaware the closing costs were not part of the borrowing base he saw in the Closing BBC.  (*See* Sept. 28, 2013 Godinez Dep. 145:14–148:14).  Mr. Godinez also testified he understood the payoff amount to be the approximately $23,900,000.00 figure reflected in the Closing BBC.  (*See id.* 149:9–151:20).  Finally, the closing costs were increased by $100,100.00 after Mr. Godinez decided to close on the Loan (*see* Mar. 22, 2013 Notice of Filing Ex. 29), and the $1,549,887.69 Excess Loan Availability figure reflected on the Closing BBC was far from the actual Excess Loan Availability at closing.  (*See* Feb. 12, 2013 Jay Stein Aff. ¶¶ 9–12).

In sum, genuine issues of material fact remain as to whether Dantzler knew of the falsity of PNC's alleged misrepresentations.

### 4. Dantzler's knowledge of overstated inventory and loan availability

PNC argues even if it did make a false statement of material fact to Dantzler, and failed to subsequently disclose the same, summary judgment should still be entered in its favor on the misrepresentation claims because Dantzler knew the statements were false prior to the closing and/or the purported falsity was obvious to Dantzler.  (See *Mot.* 18).  PNC argues Dantzler cannot rely on a representation if it knew the representation to be false or the falsity is obvious. (*See id.* (citing *Butler*, 44 So. 3d at 105)).  Dantzler insists it did not know it lacked the qualifications for the Loan, it could not determine how PNC determined its qualification for the Loan, and it never actually investigated the updated inventory figures because PNC never required it to do so.  (*See* Resp. 15).

In support of its argument, PNC relies exclusively on the testimony of Mr. Potter.  (*See* Mot. 19 (citing Dec. 13, 2012 Potter Dep. 36:7–40:22, 79:7–80:1, 85:14–89:6, 85:14–97:4, 87:5–25, and 88:10–89:6)).  Mr. Potter testified he was aware of PNC's initial instructions not to

update certain information on the Closing BBC and believed PNC had given such an instruction as a form of waiver to obtain approval of the Loan. (*See id.*). Mr. Potter further testified if Dantzler had updated the Closing BBC it would have reflected a lower availability. (*See id.*). However, Mr. Potter also testified Ms. Noa handled the preparation of the BBCs, and he did not have any involvement with the preparation. (*See id.* 35:4–36:6). Mr. Potter testified he was not familiar with the reporting PNC required from Dantzler prior to the closing, but stated Ms. Noa was familiar. (*See id.*; *see also id.* 88:1–9 ("Q. Why didn't you go through the exercise, then, of having that information updated to find out what the true availability was? A. Because I really wasn't involved directly in that. It was just – I was just being a sounding board for [Ms. Noa], as far as that was concerned.")). Mr. Potter additionally testified he had not discussed the reporting requirements with Mr. Godinez. (*See id.* 88:10–24).

Although Mr. Potter acknowledged PNC's initial instructions not to update certain information constituted some sort of waiver to obtain approval of the Loan, there is still a dispute of fact as to the scope of the waiver or the extent to which PNC was overstating Dantzler's Excess Loan Availability. Indeed, when Mr. Potter was asked to define what he meant by waiver, Mr. Potter explained, "Well, let's say that I have a covenant that I'm supposed to come in on a 2.5 debt-to-equity ratio, and I end up with 2.52. And you say, 'Okay. Well, you know, let's — let's call it 2.5.'" (*Id.* 79:22–80:1). Mr. Potter's example illustrates he may have understood the Excess Loan Availability to be near the required threshold of $1.25 million. Consequently, Mr. Potter's acknowledgement that he knew the Excess Loan Availability to be artificially inflated to some unspecified extent does not definitively demonstrate he knew PNC's representations regarding the collateral reporting requirements falsely overstated the Excess Loan Availability to the extent it would ultimately close at. As PNC made a specific

representation of Excess Loan Availability to Dantzler in the Closing BBC, it is not sufficient for purposes of deciding summary judgment that Dantzler's controller merely knew the Excess Loan Availability was overstated by some indeterminate amount.

Additionally, PNC directs the Court to no item in the record demonstrating Mr. Potter knew the falsity of the Closing BBC with respect to closing costs and the GE Capital loan payoff amount. These alleged misrepresentations — final closing costs and the GE Capital loan payoff amount — also form part of Dantzler's misrepresentation claims. Accordingly, genuine issues of material fact remain on the subject of whether Dantzler knew the falsity of every material facet of the overstated Closing BBC, and summary judgment is inappropriate.

### 5. PNC's waiver of the condition precedent

PNC asserts it is entitled to summary judgment on the misrepresentation claims as Dantzler knew before proceeding with the closing that it did not meet the $1.25 million Excess Loan Availability requirement and that PNC had waived this requirement. (*See* Mot. 21). PNC explains the only inaccuracies in the Closing BBC's Excess Loan Availability were attributable to Ms. Noa's failure to input the correct GE Capital loan payoff amount, and her failure to put in the closings costs — facts known to both PNC and Dantzler. (*See id.* 20). Consequently, Dantzler cannot maintain a claim based on PNC's alleged misrepresentation of the Excess Loan Availability at closing. (*See id.* 19–20). Dantzler contends PNC's argument is misleading as PNC "never clearly communicated" that it had waived the Excess Loan Availability requirement. (Resp. 3). Dantzler further argues the Excess Loan Availability did not comply with the record evidence of PNC's own internal waiver requirements as the shortage was greater than the amount approved by Mr. Kosis. (*See id.*).

PNC presented a similar argument in its Motion to Dismiss, and the Court held,

"Defendant's argument about waiver is merely a statement of fact to counter Plaintiffs' allegations of fact — on a motion to dismiss, Defendant's contrary statements of fact are irrelevant.   Nowhere in the Complaint do Plaintiffs allege Defendant waived the condition precedent." (April 19, 2012 Order 23).  PNC now asserts the record evidence provides such facts to resolve any issue regarding PNC's waiver of the $1.25 million Excess Loan Availability requirement.

In her deposition, Ms. Noa admitted she understood the Excess Loan Availability was not the $1.549 million represented on the Closing BBC as the closing costs and attorney's fees had not been subtracted, and the payoff amount from the GE Capital loan had not been updated.  (*See* Sept. 18, 2012 Noa Dep. 191:22–192:19, 198:3–199:3).  Thus, both Ms. Noa and PNC were aware prior to closing that the Excess Loan Availability reflected on the Closing BBC was overstated.  (*See id.* 192:1–8).  Nevertheless, PNC contends it advised Ms. Noa it had waived the $1.25 million Excess Loan Availability requirement in order to close the Loan.  (*See* Feb. 12, 2013 Notice of Filing Ex. 17).

"Waiver is the intentional relinquishment of a known right."  *Costello v. The Curtis Bldg. P'ship*, 864 So. 2d 1241, 1244 (Fla. 5th DCA 2004).  "Contractual terms may be waived, both expressly and implicitly, by the party to whom the term benefits."  *Husky Rose, Inc. v. Allstate Ins. Co.*, 19 So. 3d 1085, 1088 (Fla. 4th DCA 2009) (alteration, citation, and internal quotation marks omitted).  "The elements of waiver are: (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right."  *Id.* (citation and internal quotation marks omitted).  "The waiving party must possess all of the material facts for its representations to constitute a waiver."  *Id.* (alteration, citation, and internal quotation marks omitted).  "In order to constitute waiver, the party's conduct must establish clear relinquishment, and while conduct can imply waiver, the conduct relied upon to do so must make out a clear case of waiver."  *Costello*, 864

So. 2d at 1244 (citation and internal quotation marks omitted).

In support of its assertion of waiver, PNC refers the Court to an e-mail from Ms. de Ojeda to

Mr. Godinez on April 29, 2011, which stated:

> Hi [Mr. Godinez],
> Please review the revised pay-off letter and sign.  It is month end so we got to get this
> to the loan processor as soon as possible.  We are still a bit short on the hurdle but
> [Ms. Noa] is looking at a new borrowing base (hopefully that takes care of it).
> Peter's boss allowed us to be $150,000[.00] short so we just got to cover another
> $130,000[.00].
>
> In the meantime please let's get this signed.

(Feb. 12, 2013 Notice of Filing Ex. 17).  This e-mail does not demonstrate a clear intention to

relinquish the condition precedent as is required to establish waiver under Florida law.  *See Husky*

*Rose, Inc.*, 19 So. 3d at 1088; *Costello*, 864 So. 2d at 1244.  Although the e-mail indicates a

willingness to be $150,000.00 "short," the e-mail does not specify what amount PNC was willing to

fall "short" of.  Moreover, the next sentence does not specify whether the additional $130,000.00

would bring the Excess Loan Availability to the supposed $150,000.00 waiver mark, or whether it

was already within that limit.  Also, the e-mail asks Mr. Godinez to sign the revised pay-off letter,

indicating the Loan was going to be closed irrespective of any shortfall.  Consequently, the e-mail

merely demonstrates an ambiguous intention to potentially relinquish some condition precedent.

Any alternative reading requires the Court to draw inferences against Dantzler — inappropriate on

summary judgment.  *See Chapman*, 229 F.3d at 1023 (citation omitted).

Even if the Court did find the e-mail clearly manifested an intention to waive the $1.25

million Excess Loan Availability requirement, the evidence demonstrates PNC solely contemplated a

waiver up to $150,000.00.  Yet, the evidence indicates Dantzler's Excess Loan Availability fell short

of even the $150,000.00 waiver.  Although Dantzler was initially $139,000.00 short of the $1.25

million Excess Loan Availability requirement, this total did not account for the additional

$100,100.00 in closing costs added to the final disbursement letter.  (*Compare* Mar. 22, 2013

Notice of Filing Ex. 25, *with* Mar. 22, 2013 Notice of Filing Ex. 29).  As such, Plaintiffs failed to meet the $1.25 million Excess Loan Availability requirement, and the shortfall exceeded the purportedly authorized $150,000.00.  Accordingly, the cited record evidence fails to establish there is no genuine issue as to any material fact concerning whether Dantzler knew PNC waived the Excess Loan Availability requirement, and summary judgment should not be entered on this ground.[11]

**B.    The Mutual Mistake Claims**

In Count III of the Complaint, Dantzler asserts a claim of mutual mistake in connection with the Loan closing.  "'A court of equity has the power to reform a written instrument where, due to a mutual mistake, the instrument as drawn does not accurately express the true intention or agreement of the parties to the instrument.'"  *USAA Cas. Ins. Co. v. Threadgill*, 729 So. 2d 476, 478 (Fla. 4th DCA 1999) (quoting *Providence Square Ass'n, Inc. v. Biancardi*, 507 So. 2d 1366, 1369 (Fla. 1987)) (internal quotation marks omitted).  "The term 'mutual mistake of fact' is one of law, and the equitable remedy of rescission is available only if the mistake is mutual and the fact is of the essence of the contract."  *Keystone Creations, Inc. v. City of Delray Beach*, 890 So. 2d 1119, 1127 (Fla. 4th DCA 2004) (citing *Pendelton v. Witcoski*, 836 So. 2d 1025, 1026 (Fla. 1st DCA 2002)).  "A mistake is mutual when the parties agree to one thing and then, due to

---

[11] As related support on the issue, PNC relies on *D.O.P. Investments, Inc. v. Oakland Hills Joint Venture*, 909 So. 2d 355 (Fla. 4th DCA 2005), to argue summary judgment is appropriate on a claim for fraud where a party becomes aware of the issue and still closes on the transaction.  (*See* Mot. 21–22).  But the record does not demonstrate the absence of a genuine issue of material fact regarding Dantzler's knowledge of PNC's intention to waive the the Excess Loan Availability requirement.  PNC further argues "the Court should reject Plaintiffs' argument that they can avoid the consequences of their decision to enter into the Loan Agreement because PNC allegedly misrepresented to Plaintiffs that they qualified for the Loan."  (Reply 13–14 (citing *Azar v. Nat'l City Bank*, 382 F. App'x 880, 884 (11th Cir. 2010)).  The misrepresentation in *Azar* was materially different than the Loan here, involving the generation of a specific Excess Loan Availability in a commercial revolving credit facility and a specific, corresponding condition precedent to the Loan.  The present case does not involve the general ability to qualify for a private mortgage, as was at issue in *Azar*.  *See id.*

either a scrivener's error or inadvertence, express something different in the written instrument." *Circle Mortg. Corp. v. Kline*, 645 So. 2d 75, 78 (Fla. 4th DCA 1994) (citations omitted).

In support of summary judgment on the mutual mistake claim, PNC asserts Dantzler's allegations are unsubstantiated as PNC asked Dantzler to update its inventory, PNC provided correct directions with regard to what inventory data to report when preparing the Closing BBC, and Dantzler knew the inventory reporting requirement's impact on the Closing BBC.  (*See* Mot. 22).  PNC concludes, "the undisputed facts show that Plaintiffs' mutual mistake claim for rescission is without any factual merit whatsoever, and thus summary judgment must be entered in PNC's favor."  (*Id.*).  None of these assertions relied on by PNC is beyond factual dispute. The Court has already determined there is a genuine issue of material fact concerning whether Ms. de Ojeda's e-mails were clear requests for Dantzler to update inventory rather than a request for input on the matter.  *See supra* Part III.A.3.ii.  The Court has further determined there is some evidence PNC deviated from its own formula ostensibly outlined in the March 2011 Instructions, and therefore there is an issue of fact as to whether the directions were even static.  *See supra* Part III.A.1.  Finally, there is evidence contradicting that Dantzler knew the inventory reporting requirements' impact on the Closing BBC, as Ms. Noa did not check Dantzler's inventory in response to Ms. de Ojeda's email, *see supra* Part III.A.3.ii., and Mr. Godinez recognized the difficulty in determining inventory figures during a particular month from looking solely at sales and collections figures as inventory did not necessarily correlate (*see* Sept. 28, 2012 Godinez Dep. 20:11–22:15).  Accordingly, PNC is not entitled to summary judgment on the mutual mistake claim.[12]

---

[12] In response to PNC's arguments on this issue, Dantzler contends even a unilateral mistake of fact may provide a basis for the rescission of a contract.  (*See* Resp. 17).  The Court does not address this ancillary argument as Dantzler plainly alleges a mutual mistake of fact, not a unilateral mistake of fact.  (*See, e.g.*, Compl. ¶¶ 97, 102 ("In the alternative, neither Dantzler nor PNC would have closed on the Agreement

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that PNC's Motion **[ECF No. 104]** is **DENIED**.

**DONE AND ORDERED** in Chambers, at Miami, Florida, this 20th day of May, 2013.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:  counsel of record

---

had Dantzler been directed to update the inventory data used for preparation of the Closing Certificate such that the Closing Certificate would have reflected loan availability / working capital for less than $1 million. . . . But for the instructions received from PNC which resulted in the generation of the Closing Certificate, neither party knew that there would be inadequate credit available post-closing once the inventory figures were updated in order to 'match' the accounts receivable figures.")).  Any attempt to argue unilateral mistake on summary judgment would be beyond the scope of the Complaint.  *See GeorgiaCarry.org, Inc.*, 687 F.3d at 1258 n.27 (citations omitted) ("It is well-settled in the 11th Circuit that Plaintiffs may not amend the complaint through argument at the summary judgment phase of the proceedings.").